The next case today is Deborah Katz v. Belveron Real Estate Partners, LLC, et al., Appeal No. 20-1724. Attorney Mack, please introduce yourself for the record and proceed with your argument. Thank you, Mr. Toomey. May it please the Court, my name is David Mack. I represent Deborah Katz, the appellant and the plaintiff below. Before I proceed, Chief Judge Howard, may I reserve two minutes, please, for rebuttal? Yes. This is an appeal of a summary judgment decision in which, respectfully, the District Court missed the essence of Katz's claims. The pivotal question, which was never addressed by the District Court, is whether, but for the misrepresentations and omissions, Ms. Katz would have held on to her 48% economic interest in Fallsview rather than sell it. Instead of looking at that pivotal question, whether she would have retained her interest rather than sell it, the Court erroneously focused on whether the misrepresentations and omissions affected the selling price. This misplaced analysis was the linchpin of the Court's erroneous decision insofar as most of the claims were concerned. This Court should reverse the District Court and remand for a trial where this pivotal issue is resolved by a finder of fact because the record, when viewed in the light most favorable to Katz as the non-moving party, supported all the elements of a fraud claim against Belveron and Sisler, as well as the related claims against those same defendants and AHP and Mr. Orn. There was abundant evidence in the record that the Court simply did not quote or did not reference as to Katz's lack of a desire or a need to sell her interest in Fallsview. Here are just a few examples. Page 537 of the appendix, she testified, quote, I did not want to sell my interest. 535 to 536, I reached out to Oldenburg, the general partner, and Dodge, the representative of the limited partners, because, quote, I would have wanted a sale of Fallsview, the project. 553, quote, I was not courting Sisler. He was courting me as wanting to purchase my interest. Page 555, I didn't want to sell my interest. Belveron was asking me to sell my interest. Katz also testified that after the sale of her interest, she didn't have any particular use for the money. She testified, quote, I just ran my life, didn't have any particularly large expenses. That's at page 560. Defendants never put in any evidence for summary judgment purposes of Katz's financial condition to suggest that she was in any kind of duress or need to sell. This is similar to Lawton, where on remand, the court noted that the plaintiffs would have held their shares because they were not in financial distress. So for summary judgment purposes, the court should have accepted as true that Katz did not want nor need to sell her interest in a standalone transaction, and she did not need it to meet her everyday needs. Mr. Mack, since you're talking about the merits, can I ask you this question? You have acknowledged in your briefing, and I think the record supports this, that the other two parties here, Belveron and AHP, did not wish to sell the property, which was her desire, and who's to say or what's to say isn't entirely speculative about whether they would have sold the property, and so my question is, what is her proof of loss or what is her proof of damages? How can she even establish that? Sure. Well, I think if there's evidence in the record, looking at it from a traditional fraud standpoint, the elements obviously are material misrepresentations made for the purpose of inducing reliance and causing damages. If there's evidence in the record, which we submit there was a wealth of evidence, that she would have held on to her interest had the misrepresentations and omissions not been made, then the question needs to be decided as to whether when the property in fact did sell. No, that's my question. Right. The evidence in the record is that the property would not be sold. Well, your honor, I think that the problem with the district court's analysis, and I'll of the fraud case froze by the district court when she sold her interest, but that's respectfully, the question is, if there is information in the record to believe that that transaction never would have happened, meaning the sale of her interest, the question is whether she would have been at the table when the sale did occur. So you're not answering my question. I'm about to get to it, your honor. Oh, please. Because the case law says that when you are a defrauded seller. And you're not defrauded unless there's loss that you can prove. Correct. And in your briefing, you say that the other two parties did not want to sell the property while she was still involved. Correct. Well, no, I think that's not, your honor, at that time, they didn't want to sell it. That's right. So what is the evidence that they would ever sell it? That's all I'm asking. Because when the property did, in fact, sell, the representations related to Ms. Katz's ability eventually to liquidate her interest through a sale of the property, that's when she got the full value of her interest. And the evidence, first of all, when this occurred, they were not interested in selling. But the problem is they misled her to believe that they had the power and the voting control to ask that decision whether to sell the property. The fact is they lied to her about that. And if one believes that she would have retained it, then, one, there's evidence in the record that the two parties that did have voting control, Ms. Dodge, who represented the investors, supported a sale. Oldenburg, he equivocated. He had testimony going in both directions. He said he would have gone along with whatever the partner wanted. So the question is, at that time, if one believes that she would have held her interest, the fact that for fraud purposes, you have to establish intent to induce reliance. When they made those statements, they intended to get her to divest her interest by making her believe that if she didn't, she'd be stuck in this partnership until 2043, which is when it ends. And by causing that conduct, you then look at, well, what would have happened had she retained it? Is there something about the structure of these partnerships that would have prevented her from getting the correct information? Yes. Well, she asked, well, I think that's a fair question, but for a jury to decide, Your Honor. She was a limited partner in a special limited partner of Fallsview Associates Limited Partnership. She had no right to vote. She had no right to specific information as to the underlying limited partner, meaning WRC 1983 Limited Partnership. She was totally at the mercy of the sole limited partner and the general partner. She asked for information. She asked who Belveron was. She was led to believe that Belveron was in control when, in fact, Belveron had no voting rights. Did she ask the general partner? There's evidence in the record that she was asking who Belveron was and she was directed to it. Asking who? Did she ask Oldenburg?  sell. She believed based on what? Why? It's not that she wasn't a sophisticated limited partner. She did this herself for a living. It's her father who set this up, so she knows how these tricky partnerships work in this housing area. That's correct. She certainly had means to get the information if she had done her due diligence. I think, Your Honor, these are fair questions. It's reasonable reliance also. Correct. And I think, Your Honor, in our view, based on the information that she was given, she was led to believe that Belveron had control. Could she have asked better questions? Perhaps, but I think, Your Honor, these are... the exercise of a certain amount of due diligence, she could have found out the answers to this. I think that those are fair questions, but again, for materiality and reliance, those are ordinarily not susceptible to summary judgment decision. I think you have to look at the record as a whole and based on the information she was given, she originally went to the general partner and the person that she understood represented the investors. And she said, what's going on? I'd like to sell the property. And they said, well, Belveron's the one making the decision. They're calling the shots. At that point, clearly, she could have done more, but whether that's reasonable and whether that's what somebody else would have done in the circumstances, those are questions for a jury. That's the issue. All these cases that deal with what happens after a person is defrauded into selling, all the cases, the Jannigan, Lawton, Anson, they all went to a trial to determine what would have happened had they retained their interest. And that's the issue here. The fact is, there's nothing in the record to suggest that when the property did, in fact, sell. And the timeline is not very far. I mean, they looked to sell the property within 10 months of buying Ms. Katz's interest. There's nothing in the record to suggest that while they may not have wanted Katz in the partnership, that when they learned that the property was, in fact, worth $11.7 million, which is so far afield from what they thought it was worth, that they wouldn't have jumped at the chance to sell, even if they had to share some of the profits with Katz. Those are the questions that have to be answered at trial, Your Honors, and that she wasn't given a chance to do so. The teaching of Jannigan and its progeny is, well, you have the passage of time between the time where you were misled into one transaction and the time that the transaction occurs, the later transaction that shows the greater value. Counsel, when you say in your brief that Orne, I think it's pronounced Orne, concealed from Katz that Belveron was going to be involved in her divestiture of interest, and that Orne knew that she would not approve of that, did she propose in the contract that there could not be a sharing or any alienation of her interest to Belveron? What's in the record to suggest that she did anything to prevent that from happening? There's nothing in the contract, Your Honor, that said don't share any of this money with Belveron. She relied on the statements that they weren't working together, and again, whether she could have done more to protect that materiality, those are facts. You said she did not have information about the structure, about who had what rights. You've been asked about what her ability was to inquire into it and what she might have learned. So if she doesn't know, then she doesn't know that it isn't going to be shared in some fashion. Correct. She's sophisticated. So under those circumstances, if she truly has this concern, wouldn't she take contractual steps to protect her interest? Well, I think the biggest issue, you have to look at the three representations as a whole, and the biggest misrepresentation, if I could rank them, was the fact that she was led to believe that the person in charge of the decision whether to sell this property, where she would realize a liquidity event in her lifetime, was Belveron, and that was simply not true. Belveron had no voting rights and, in fact, didn't even have a majority interest in the limited partnership economically, and so when she was led to believe that she was stuck either trying to get what she could for this interest or sitting there at the mercy of Belveron while it collects the cash flow from the rents until potentially 2043 when she'll be in her 80s, she felt like, okay, let me unload it and see what happens. I understand. Let me just ask a related question. If she believes, you say wrongly, that because they misled her that Belveron would make the decisions about whether the property could be sold further, and she doesn't want to sell her interest to Belveron, so she sells it to Katz, why would she, under those circumstances, think that Belveron couldn't decide to sell the property when she was operating under the impression that it could? Well, I think she believed Belveron when Belveron said, I am not going to sell the property. We are not going to sell it. It's in two different places in writing in addition to what she was told. She was led to believe that she was locked into that. Of course, it's always possible in the future, and in fact, it turned out to be true, that it could be sold, of course. And so that's one of the questions that a jury has to decide. So if this were a case where 10 years down the road, it was sold, obviously, it's a much different case. But what happened was a short time period after she sold, and the evidence is disputed that the property was worth a lot more, and was pretty close, we think, to what it was eventually sold for 18 months later. Did she ever get her own valuation of the property? She believed that the property was worth a lot more. We've made it clear. That's not the question. The question is, as part of her due diligence, did she get an estimation of the value of the property before she sold it? She did not, but, Your Honor, that wasn't material to what she was relying upon. She knew that the property was worth a lot more than what the defendants thought it was worth, and I think that the evidence shows that she's right. However, what she was relying upon was the prospects of a liquidity event, and a prospect of being stuck in this partnership. That's what she was relying upon. She wasn't relying on the defendants, what she believed were not fair valuations of the property. She knew that the property was worth a lot more, but she felt like she was stuck in this, and therefore, she had to unload her interest, or she might never see a penny in her lifetime. Let me stop you there and ask if the court has additional questions at this time. All right. You've reserved some time, Mr. Mack. Thank you, Your Honor. Could you give me 10 seconds? Yes, of course. Thank you, Mr. Mack. You can proceed to mute, and Attorney Todd, if you would unmute your microphone and video, but do not start your argument yet, please. Thank you. All right. Ms. Todd. Good morning, and may it please the court. I'm Erica Todd, representing Belveron Real Estate Partners, LLC, and Grant Sissler. When Deborah Katz acknowledged that the allegations in the operative complaint are not true, summary judgment became the only appropriate response. The district court's grant of summary judgment shouldn't be upheld for three separate and independently sufficient reasons. First, Katz abandoned her allegations, and her attempt to rely on new arguments that she did not plead was improper. Second, even if she were allowed to change her allegations, she could not establish wrongdoing, and third, she cannot establish damages. Despite Mr. Mack's comment that there was some evidence that's disputed about value in 2014, she has not provided any evidence that $1.5 million was an unfair price for her interest in 2014. At her deposition, she was repeatedly asked to provide any such evidence, any comparisons to other properties that sold in the relevant time period. She could not provide anything. Instead, she argues that the 2016 price is evidence of 2014 value, but it is not. Andrew Deitch, the real estate professional who sold the property, testified that the market for this particular type of property saw tremendous, his word, growth in 2015, and he also explained the technical factors that led to that growth. For example... Excuse me, let me just check you on one thing. I think that your brother said that in 2014, she believed the value was closer to what it turned out to be in 2016. Did she say that in her deposition or anywhere? There is no contemporaneous evidence that she believed the value was anything other than $7 million in 2014. In 2014, she made a comment to Gina Dodge, who remembered it, that Katz thought the property was worth $7 million. Additionally, there is an email in the record where Grant Sisler writes, I know you think it's worth $7 million, but that is not attainable or something to that effect. So all of the contemporaneous evidence is that Katz believed the property was worth around $7 million in 2014. Certainly in the course of this litigation, she has revised that upwards. So Andrew Deitch explained that there are very technical reasons that this type of property exploded throughout 2015. And in the Lawton case, this court held that a sale price in 1997 was not a reasonable proxy for market value in 1996. So it is not the case that we can look at a sale in 2016 and say, it must have been worth about this in 2014. So instead, Katz argues that she can calculate damages as though she had continued to hold her interest until 2016. Just a few moments ago, counsel argued that the pivotal question is whether but for the defendant's conduct, she would have retained her interest. That's not correct. Damages must be foreseeable. In 2014, it was not foreseeable that in 2016, the property would be sold at all, let alone for $11.7 million. Oldenburg was the general partner. He was not doing anything to pursue a sale in 2014. He had not received any sale offers regarding the property in 2014. There was no reason for anyone to think it would be sold. And there was certainly no reason to think that it would be sold for $11.7 million. Instead, there is substantial evidence on the record that the remaining investors were happily shocked but very shocked at this sale. There's an email from Oldenburg writing that Santa Claus came early this year. And there's no contrary evidence. There's nothing, as your honors indicated, in the record showing that a sale was anticipated in 2014. Ms. Todd, at least in the area of securities law, there's a doctrine that if there's fraud in the inducement, then the damages don't have to be foreseeable. Any damage that, as a matter of fact, flows from that fraud can be ordered to be disgorged or results in damages that are recoverable. Are you familiar with those? Yes. Oral areas to what you're saying. And tell me why that wouldn't apply here. Yes, your honor. And that line of cases, and there are some caveats that I don't need to get into right now, because that line of cases applies only when the wrongdoer has retained the interest that was sold under false pretenses. And the wrongdoer itself profits from the later sale. So that's the Janigan case where the later profits from a sale were unforeseeable. No one saw them coming. But it was unjust to allow the wrongdoer to retain the fruit of the deception. In this case, that doctrine cannot be applied to my clients because they did not retain or ever receive anything. My clients are Belvron Real Estate Partners LLC and its employer, Grant Sissler. Belvron is an entity that oversees a number of investment funds. And Belvron itself never purchased any part of the interest that Katz once held. Instead, there was a Belvron-affiliated investment vehicle that purchased a portion of the proceeds. That is the investment vehicle that received the profits from the eventual sale of the property. And it's those that funds investors who ultimately profited. So the defendants in this case have nothing to disgorge. So these disgorgement doctrines, which follow basic equitable principles, some of the oldest we have in law, that someone cannot profit from their wrongdoing. We obviously oppose that. Do not apply to these defendants, Belvron and Sissler, who never saw a dime. Thank you. I'd like to address briefly Attorney Mack's comment that focused on testimony regarding Katz's lack of desire to sell. And I'm a little troubled because that testimony contradicts the operative complaint. Paragraph 39 of the complaint states that Ms. Katz desired to sell the property or at least liquidate her ownership in the company at the highest possible price. That is what she put in her pleading. And this is not a trivial problem. Her desire to sell her interest is not the sort of fact about which there could be a good faith mistake. This is her complaint. It is her subjective feelings. If she put a false statement about her desire to sell in the complaint, that's not something we can sweep under the rug and say, well, it doesn't matter because she testified differently. Additionally, Your Honor, Judge Thompson explained that reasonable reliance is what matters. And I fully agree with that. I would also say that whether there was reliance at all matters. She was not deceived. She did not think that Belvron was in control. She actually, in the summer of 2014, retained counsel to write to Oldenburg and complain about the decisions that he had been making about the property. That's document 450 in the appendix. It's a very litigious letter. And it evinces that Deborah Katz had no doubt that Oldenburg was in control, driving the future of the property, making decisions she didn't agree with. And then she testified at her deposition that she believed that Richmond, the limited investor shell, was driving the decisions. So not only could there not have been reasonable reliance, but there was not reliance in fact, which goes to a similar argument that she made in support of her fiduciary duty claim. She says, well, a jury could find that Katz could have relied on Grant Sissler or Belvron. She didn't, though. She testified specifically that she did not trust Belvron. So all of these little facts that she's trying to gather snippets here and there, none of them put together a comprehensive case of why she could ever have a claim against these parties. Additionally, since she's now abandoned her allegations, she doesn't have any false statements. There were no false statements. Instead, she's relying on the idea of a half truth. And I believe it's worth distinguishing the case that she talks about here, the Cannabis versus the Nino Supreme Judicial Court decision. In that case, there were unsophisticated investors who bought property to use as an investment. The property was advertised to them as containing multiple apartment buildings. And when they toured it, there was a refrigerator in every different unit. There was a stove in every different unit. It was very clearly an apartment building. What the sellers very intentionally did not disclose is that that violated the zoning and building laws. This was a situation where unsophisticated buyers thought they were getting one thing, investment property that they could use as rental property, and they were not getting that. The idea of a half truth still requires materiality. And the idea that a Belvron-affiliated fund purchased some portion of the interest, there's no materiality there. Spite is not a cognizable interest in Massachusetts. The fact that Katz disliked Sisler is not relevant to any claims for damages. Questions from the court? Anything further, Ms. Todd? I have nothing further. All right, thank you. Thank you. If you would go ahead and mute your device. Mr. O'Connor. Yes, thanks, Your Honor. Can you see me? Yes. Okay. I represent AHP and Matt Oren. There's considerable overlap between the position that my clients are in and our co-defendants. And we certainly incorporate and rely on all of the same points and the arguments that Attorney Todd just made. If I can, in the few minutes that I have, I would like to address the 93A claim, which is directed against my client only. Interrupt me if there are any questions or if you want me to go in a different direction. But I wanted to address that claim briefly, if possible. This is a Section 11 claim. This is not a consumer claim, obviously. So the higher, more demanding Section 11 threshold applies. The district judge saw this as an appropriate case for a summary judgment and not a Section 11 violation. He was absolutely correct. And I commend that perspective to this court. This simply is not a Section 11 case, not even remotely close to it. You have, on the one hand, a very sophisticated, knowledgeable plaintiff who's assisted by lawyers from two law firms, who's lived in that area, who's grown up with this property, formally managed it. And whatever she may claim currently about her information deficits, she knew more about that property and the data and the numbers regarding that property, certainly than my client and our co-defendant. So she's on the one side of the transaction. And then on the other side, you have some willing buyers, also in the same industry, also knowledgeable, sophisticated players, but who have less information than the plaintiff. And everybody understands what everybody's about, which is an arm's length negotiation over an asset that everyone has an interest in. And what's abundantly clear is that the plaintiff wants to sell it. She admitted that in her pleading, as Attorney Todd just pointed out. And that's a judicial admission that's binding on her. And she admitted it through her actions, as a matter of recorded facts that aren't disputed. She was trying to sell it to Oldenburg for $2.8 million. She made clear to Gina Dodge that she would sell it. Then she offered to sell it to Belveron. Then she offered to sell it to my client. She wanted to sell her interest. She's a willing seller. She's not trapped. She's not forced for any reasons to sell. She wants to sell. She wants to liquidate her share. So if she is saying the opposite, that is, at the time she sold, if she'd known Belveron was involved, she would not have sold? Do we have a material dispute of fact? No, Your Honor. We just have intentional and, frankly, cynical self-contradiction by a claimant that is coming to grips with the fact, during the course of discovery, that she doesn't have a claim and is trying to cobble something together. That's all we have. We know from her actions she was happy to sell to Belveron. She made multiple demands on them. She was at $1.8 million and Belveron was at $1.2. If they'd offered her $1.8, she would have done business with them. And then she started talking to Orn. And the reason she started talking to Orn, we know this from the record. If I can read from an email, just a portion of an email that Sizzler sent her. Also, I have cc'd Matt. I gathered from our conversation today that you thought Belveron and AHP worked together. So she obviously knows there's some coordination and communication between AHP and Belveron. She's asking about it and he's answering her question. The email continues. Matt's group is very different than Belveron's, a true statement, though we both work on the secondary market. Another true, uncontradicted statement. We have different structures and return hurdles. Also true. I have cc'd Matt on this email in case he's interested in purchasing your interest. And let me know if you're willing to come down to a more reasonable number than $1.8 million. So that was what started the conversation between the plaintiff and Orn. Orn has cc'd on this email. Orn, the plaintiff, and Sizzler then exchange further emails in which they're all copied so that it's abundantly clear as a matter of writing, as a matter of undisputed fact, on the record, she knows these guys are coordinating. They're working together. They're sharing bidding information. They are not independent, obviously. We also know, this is interesting, she's not in a rush to sell. She won't take $1.2 million, which was the last number offered by Sizzler. She's willing to stand pat at that number. She broke off the conversation with him at that number. It was only when Orn got involved and sweetened the deal and offered another $300,000 that she got her number. And she sold at that time because she got what she wanted. And this is, again, I circle back to my larger point. This is not a Section 11 case. This is just a garden variety negotiation and transaction of the sort that happens every day in this commonwealth and in this country. It can't be a situation that gives rise to a claim for a jury and a judge to spend two weeks considering whether this plaintiff somehow was treated unfairly. No, this is not... Was Ms. Katz represented by counsel throughout these proceedings? Yes, Your Honor. She had two law firms representing her at all pertinent times. They were corresponding, as Attorney Todd said, with the general partner going back as early as 2012 about the value of the share. And they represented her during the course of the negotiations and the closing. And in fact, her lawyer sent an email to the lawyer for AHP saying he thought the deal was great and fair, which it most certainly was. Oldenburg thought her share was worth $1.5. Dodge thought it was worth $1.5. The municipal assessment of the whole property was only $5.4, which correlated perfectly with the sale price of $1.5. The refi proposals that were on the table would have yielded her less money than the $1.5 AHP paid her. Everything points in the same direction, that that was a fair price. And the plaintiff, who had more knowledge and experience than anyone with that property, knew it was a fair price, so she took it. But there's no Section 11 violation there. And go ahead, Your Honor. Thank you, Mr. O'Connor. Are there other questions from the court? All right. Thank you. If you would go ahead and mute your devices. Thank you. Mr. Mack? Yes, I have a few points. First of all, on the testimony of Ms. Katz concerning $10 million valuation, see pages 524 and 554 of the appendix, she testified unequivocally in their deposition that she thought the property was worth $10 million in 2013. Second, there's testimony, there's evidence in the record that disputes whether Belveron, this particular Belveron, Excuse me. Counsel made the point that in 2013, there's evidence in the record that she thought the property had a different value, something more akin to $7 million. Yeah, well, there's your testimony. As opposed to latter testimony in a deposition. Is there anything contemporaneous with her sale that shows she believed the property to be of greater value? Yeah, well, there's all sorts of evidence in the record that shows that the value of the property was, in fact, closer to what she thought was $10 million than the five to six that they professed it to be. Is there anything contemporaneous with the sale? Yes. Is there evidence that she believed contemporaneous with the sale that the property had a greater value? And if so, could you just indicate what it is? Well, you mean that she understood at that time? Yes, at the time of the sale. She said it was based on her knowledge of the building, the fact that the building had different amenities than other properties in that area, that it had two unit buildings. So there's no comparable sale. The answer, no. There's no data that she relied upon other than her own understanding of the property, and I think the evidence that we've developed shows that, in fact- Is there any data contemporaneous with the sale? In other words, are there any statements by her contemporaneous with the sale evidencing her belief that the property was worth more than $7 million? You mean sale of her interest? Yes. Yes. Her testimony that she thought that. No, in terms of statements from 2013, like in writing, no. She just testified in her deposition- She had statements by her in 2013. There are no written statements by her in 2013 in the records. Oral. Anything oral. Anything. She, I don't think there is, Your Honor. Okay. The other quick points, there is evidence in the record on page 479 of the appendix, Matt Orne testified in an affidavit that Belveron, this Belveron entity, received a portion of the sale proceeds from the sale of the property. The evidence that Belveron cites as being dispositive, which is on page 263 of the record, is an email from before the sale even happened, in which she instructs, Sisler instructs that the proceeds should be payable to a fund, but there is no evidence in the record that actually shows the tracing of the money to someone other than Belveron. And we disputed it at summary judgment. Turning quickly to some of the points that Mr. O'Connor made, the information that she lacked is what was important. The fact that she knew about the property, she understood this market, that she sophisticated, doesn't mean that she understood who had the voting power and the ability to control a future sale. That's what she relied upon with Belveron, and that's the information that she didn't have. And again, to the extent that someone can argue that she could have done more due diligence, we believe that's an issue for a trial to determine whether, under these circumstances, her reliance was reasonable. We don't think that it could be made as a matter of law, particularly since the court never addressed whether she would have held on to her interest. All it concerned is whether she would have sold for a particular price. They were comparing apples, the sale of her transaction as a freestanding entity, her interest, versus apples, when the apples need to be compared to the orange, which is the sale of the property, where the amount that she gets is so much more than what she would have received, than what she did receive. And she suffered millions of dollars of damages, and we believe that equity would determine that she's entitled to proceed against these defendants. Thank you, Mr. Mack. Thank you all. Thank you. That concludes argument in this case. Attorney Mack, Attorney Todd, and Attorney O'Connor, you should disconnect from the hearing at this time.